## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| ALIREZA PARTOVIPANAH, individually ) and on behalf of all others similarly situated, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> FIFTH THIRD BANCORP, FIFTH THIRD ) BANK, FIFTH THIRD BANK PENSION ) AND PROFIT SHARING COMMITTEE, ) GEORGE A. SCHAEFER, JR., KEVIN T. ) KABAT, ALLEN M. HILL, JAMES P. ) HACKETT, GARY R. HEMINGER, ) HENDRICK G. MEIJER, JAMES E. ) ROGERS, DARYL F. ALLEN, JOHN F. ) BARRETT, ULYSSES L. BRIDGEMAN, ) ROBERT L. KOCH, II, DR. MITCHEL D. ) LIVINGSTON, JOHN J. SCHIFF, JR., ) DUDLEY S. TAFT, THOMAS W. ) TRAYLOR, NEAL E. ARNOLD, ) MICHAEL D. BAKER, GREG D. ) CARMICHAEL, MICHAEL K. KEATING, ) ROBERT P. NIEHAUS, PETE PESCE, ) PAUL L. REYNOLDS, STEPHEN J. ) SCHRANTZ, ROBERT SULLIVAN, ) JAMES F. GIRTON and JOHN DOES 1-10. ) <br> ) <br> Defendants. ) | **CIVIL ACTION NO**. 1:08cv613 <br><br> Dlott <br><br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Alireza Partovipanah ("Plaintiff"), a participant in the Fifth Third Bancorp Master Profit Sharing Plan (the "Plan") during the proposed Class Period (defined below), alleges as follows on behalf of the Plan, himself and a class of all others similarly situated:

## <u>INTRODUCTION</u>

1. This is a class action brought pursuant to §§ 409, 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132, against Plan

fiduciaries, including Fifth Third Bancorp and its subsidiaries and affiliates (collectively, "Fifth Third" or the "Company").

2.      Plaintiff was a participant in the Plan during the Class Period, during which time the Plan held interests in the Company's common stock.   Plaintiff's retirement investment portfolio in the Plan during the Class Period included Fifth Third stock.

3.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.   An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio. Common stock of Fifth Third was one of the investment alternatives of the Plan throughout the Class Period.

4.      Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties to himself and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Plan's heavy holdings of Fifth Third stock.

5.      Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to offer Fifth Third common stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan

6.      Plaintiff's Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

7.      Plaintiff's Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Fifth Third stock as an investment option and investing Plan assets in Fifth Third stock when it was no longer prudent to do so.

8.      Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plan's assets in Fifth Third equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent due to, as explained in detail below and among other things: (a) the Company's exposure to certain poorly performing real estate markets, including Florida and Michigan, and the extent to which this exposure was materially increasing; (b) the Company's growing exposure to

late payments and defaults on mortgages and other non-performing loans, and the extent to which this exposure was materially increasing; (c) the extent of the decline in the quality of the Company's Tier 1 capital base; (d) the deteriorating credit trends and increasing expenses, including negative trends, in the Company's consumer loan portfolio, including the extent of the increase in late payments and defaults; (e) the negative trends in the Company's home equity and commercial construction loans, and the extent to which there was a decrease in the value of the underlying assets and an increase in late payments and defaults; (f) the fact that, as a consequence of the above, the Company's stock price was artificially inflated; and (g) the fact that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants.

9.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409, 502, 29 U.S.C. §§ 1109, 1132.  Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plan from breaches of fiduciary duty such as those alleged herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## **JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Fifth Third resides or may be found in this district.   More specifically, this district is an appropriate venue for this action because Fifth Third maintains numerous business locations in this district.   Further, many of the Plan's participants are located in or within close proximity to this district.

## PARTIES

### Plaintiff

12.     Plaintiff Alireza Partovipanah, a resident of New Smyrna Beach, Florida, is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Fifth Third shares in his retirement investment portfolio during the Class Period.

### Defendants

#### Fifth Third

13.     Defendant Fifth Third Bancorp is an Ohio corporation with its principal executive offices located in Cincinnati, Ohio.   Fifth Third Bancorp is the Plan sponsor. Defendant Fifth Third Bank, a wholly-owned subsidiary of Fifth Third, serves as the trustee of the Plan and the Plan administrator.   *See* SEC Form 11-K for the fiscal year ended December 31, 2007 ("2007 11-K").   *See also* Summary Plan Description of The Fifth Third Bancorp Master Profit Sharing Plan, dated August 8, 2007 ("2007 SPD").

14.     Throughout the Class Period, Fifth Third exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets, and was therefore a fiduciary of the Plan in its own right.

15.     Fifth Third acted through its Board of Directors (the "Board"), as well as officers and employees, including its Chief Executive Officer, its Director of Legal/Human Resources and the Fifth Third Bank Pension and Profit Sharing Committee

(described further below), the members of which were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

16.     Fifth Third had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities. Through its Board and otherwise, Fifth Third had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, the Company and/or its Board also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan.  By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plan, its participants and their beneficiaries.  Accordingly, the actions of the Board, the Pension and Profit Sharing Committee and/or any other employee fiduciaries are imputed to the Company under the doctrine of respondeat superior, and the Company is liable for these actions.

17.     The Company and its Board were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.  Indicative of its authority, upon information and belief, the Board was ultimately responsible for monitoring and administering the Plan, appointing, monitoring and removing members of the Pension and Profit Sharing Committee.  For example, as described below, through its Compensation Committee, the Board had the ultimate authority and obligation to review, monitor and oversee the Plan.  Upon information and belief, this included the authority to

appear and remove other Plan fiduciaries, including, without limitation, members of the Pension and Profit Sharing Committee, if necessary, in order to best serve the interests of Plan participants.

**Director Defendants**

**Chairman of the Board/CEO**

18. **Defendant George A. Schaefer, Jr. ("Schaefer")** served as Chairman of the Board during the Class Period and, until April 2007, served as the Company's Chief Executive Officer ("CEO"). Defendant Schaefer was Chairman of both Fifth Third Bancorp and Fifth Third Bank. Defendant Schaefer was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

19. **Defendant Kevin T. Kabat ("Kabat")** served as a member of the Board and since 2007, as Chief Executive Officer ("CEO") of Fifth Third Bancorp since April 2007, as President of Fifth Third Bancorp since 2006. Upon information and belief, Defendant Kabat also served as a member of the Pension and Profit Sharing Committee. Defendant Kabat was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Compensation Committee Defendants**

20. **Defendant Allen M. Hill ("Hill")** served as a director of the Company since 1998 and served as Chairman of the Compensation Committee during the Class Period. Defendant Hill was a fiduciary of the Plan, within the meaning of ERISA §

3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

21.     **Defendant James P. Hackett ("Hackett")** served as a director and served as a member of the Compensation Committee during the Class Period.  Defendant Hackett was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

22.     **Defendant Gary R. Heminger ("Heminger")** served as a director and served as a member of the Compensation Committee during the Class Period.  Defendant Hackett was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

23.     **Defendant Hendrick G. Meijer ("Meijer")** served as a director and served as a member of the Compensation Committee during the Class Period.  Defendant Meijer was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

24.     **Defendant James E. Rogers ("Rogers")** served as a director and served as a member of the Compensation Committee during the Class Period.  Defendant Rogers was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

**Additional Director Defendants**

25.     **Defendant Darryl F. Allen ("Allen")** served as a member of the Board during the Class Period.  Defendant Allen was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

26.     **Defendant John F. Barrett ("Barrett")** served as a member of the Board during the Class Period.  Defendant Barrett was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

27.     **Defendant Ulysses L. Bridgeman ("Bridgeman")** served as a member of the Board during the Class Period.  Defendant Bridgeman was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

28.     **Defendant Robert L. Koch, II ("Koch")** served as a member of the Board during the Class Period.  Defendant Koch was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

29.      **Defendant Dr. Mitchel D. Livingston ("Livingston")** served as a member of the Board during the Class Period.  Defendant Livingston was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

30.      **Defendant John J. Schiff, Jr. ("Schiff")** served as a member of the Board during the Class Period.  Defendant Schiff was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

31.      **Defendant Dudley S. Taft ("Taft")** served as a member of the Board during the Class Period.  Defendant Taft was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

32.      **Defendant Thomas W. Traylor ("Traylor")** served as a member of the Board during the Class Period.  Defendant Traylor was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

33.      Defendants Schaefer, Kabat, Hill, Hackett, Heminger, Meijers, Rogers, Allen, Barrett, Bridgeman, Koch, Livingston, Schiff, Taft and Traylor are hereinafter collectively referred to as the "Director Defendants."

**Pension and Profit Sharing Committee Defendants**

34.    The Pension and Profit Sharing Committee was charged with administering the Plan.  *See* 2007 SPD, at 1; 2007 11-K.  The Pension and Profit Sharing Committee and its members were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they were, upon information and belief, named fiduciaries of the Plan and exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

35.    **Defendant Neal E. Arnold ("Arnold")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period.  Defendant Arnold was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

36.    **Defendant Michael D. Baker ("Baker")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period.  Defendant Baker was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

37.    **Defendant Greg D. Carmichael ("Carmichael")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period.  Defendant Carmichael was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with

respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

38.    **Defendant Michael K. Keating ("Keating")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period.  Defendant Keating was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

39.    **Defendant Robert P. Niehaus ("Niehaus")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period.  Defendant Niehaus was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

40.    **Defendant Pete Pesce ("Pesce")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period. Defendant Pesce was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

41.    **Defendant Stephen J. Schrantz ("Schrantz")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period.  Defendant Schrantz was a fiduciary of the Plan, within the meaning of ERISA §

3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

42. **Defendant Robert Sullivan ("Sullivan")**, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period. Defendant Sullivan was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

43. **Defendant Paul L. Reynolds ("Reynolds")** served as the Company's Director of Legal/Human Resources, Executive Vice President, Secretary and General Counsel, and, upon information and belief, served as a member of the Pension and Profit Sharing Committee during the Class Period. Defendant Reynolds was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

44. Defendants Arnold, Baker, Carmichael, Keating, Niehaus, Pesce, Schrantz, Sullivan and Reynolds are hereinafter collectively referred to as the "Pension and Profit Sharing Committee Defendants."

**Additional "John Doe" Defendants**

45. Without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including Company officers, directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A) during the Class Period. The identities of the John Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

## THE PLAN

46.     The Plan is an "employee pension benefit plan," as defined by ERISA § 3(2)(A). Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA § 3(34). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

47.     The Plan operates as a profit sharing plan with a 401(k) feature.[1]

48.     With regard to the profit sharing feature, effective January 1, 2004, employees are eligible immediately upon hire. For the 401(k) feature, employees are eligible to participate after 30 days of service.

49.     Under the Plan's profit sharing component, the Company's profit sharing contribution to the Plan is a percentage of eligible compensation determined annually by the Board and allocated to participants in accordance with the provisions of the Plan. The profit sharing contribution is allocated to participants in the proportion that the compensation of each participant bears to the compensation of all participants for the Plan year. Profit sharing contributions for the 2007 Plan year and forward vest on a three-year cliff vesting schedule.

50.     Under the Plan's 401(k) component, the Plan provides for both participant elective deferrals and employer matching contributions.

---

[1] The information contained in this section is derived from the 2007 SPD and the 2007 11-K.

51.     The Plan permits voluntary contributions from participants up to 100% of their compensation. Such contributions are credited directly to the participants' accounts and are fully vested. Contributions may be allocated to the available investment options at the discretion of the participant. Gains and losses under the Plan are valued on a daily basis and allocated to participant accounts based on account balances.

52.     The Company matches 100% of the first 4% contributed on a pre-tax basis. A three-year cliff vesting schedule was added to the Plan as of January 1, 2004, so that after three years of service, a participant is 100% vested in the matching contributions; anything less than three years of service, a participant is 0% vested. Current service credit as of January 1, 2004, was grandfathered.

53.     Company matching contributions are initially invested in the Fifth Third Stock Fund.

54.     Participants can direct their accounts to be invested in the Fifth Third Stock Fund, two collective funds or a variety of mutual funds offered by the Plan as investment options.  As of December 31, 2007, the Plan offered 17 mutual fund options.

55.     The Fifth Third Stock Fund invests 100% in the common stock shares of Fifth Third Bancorp.  *See* Fifth Third Bancorp Stock Fund Prospectus, dated April 15, 2008.

56.     The Plan has been heavily invested in the Fifth Third Stock Fund.  As December 31, 2006 and December 31, 2007, the Plan held 4,588,460 and 4,572,430 shares of Fifth Third Bancorp common stock, respectively, with fair values of $188,439,816 and $117,551,104, respectively.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between July 19, 2007 and the present (the "Class Period") and whose Plan accounts included investments in Fifth Third common stock.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several tens of thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Fifth Third stock.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)     whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

> (b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and Beneficiaries;

> (c)     whether Defendants violated ERISA; and

(d)      whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.      Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

61.      Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

62.      Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

63.      Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

64.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

65.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

66.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Upon information and belief, the Company, the Board (inclusive of the Compensation Committee) and the Pension and Profit Sharing Committee were named fiduciaries of the Plan.

67.     Instead of delegating fiduciary responsibility for the Plan to external service providers, Fifth Third chose to internalize certain vital aspects of this fiduciary function.

**Fifth Third and Director Defendants**

68.     The Company administered the Plan through the Board, the Compensation Committee and the Pension and Profit Sharing Committee, which had discretionary authority to manage and control the operation and administration of the Plan and investment of Plan assets.   The Company, through the Board, specifically, the Compensation Committee, was, upon information and belief, responsible for appointing, evaluating and monitoring the Pension and Profit Sharing Committee.

69.     According to its charter, the Compensation Committee of the Board of Directors (the "Compensation Committee") is charged with assisting the Board in discharging its responsibilities with respect to Fifth Third's various benefit plans for the Company's employees.   According to its charter, the Compensation Committee's responsibilities specifically include the duty to periodically review the Company's benefit plans.  This included the power/duty to adopt amendments or changes to the same, and to establish procedures and mechanisms designed to cause the same to comply with all provisions under ERISA, regarding investment elections and changes thereto, blackout periods, and restrictions on trading by plan participants.  *See* Compensation Committee Charter, *available at:* https://www.53.com, accessed on August 15, 2008.

**Pension and Profit Sharing Committee Defendants**

70.     The Pension and Profit Sharing Committee was charged with administering the Plan.  *See* 2007 SPD, at 1; 2007 11-K.  Upon information and belief, the Pension and Profit Sharing Committee is a committee of employees appointed by the Board and delegated the day-to-day responsibility for the administration of the Plan.  The Pension and Profit Sharing Committee is likely a "Named Fiduciary" for purposes of Section 402(a)(2) of ERISA.  The Pension and Profit Sharing Committee has the right to amend the Plan at any time on behalf of all Fifth Third affiliates.  *See* 2007 SPD, at 22-23.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

71.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., performed fiduciary functions.  ERISA § 3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary

authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

72.     Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 843 (6th Cir. 2003).

73.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See*, *e.g.*, *Griggs v. E.I. Dupont de Nemours & Co*., 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *see also James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002); *Matthews v. Chevron Corp*., 362 F.3d 1172, 1180 (9th Cir. 2004); *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3rd Cir. 1993); *In re JDS Uniphase Corp. ERISA Litigation*, 2005 WL 1662131 (N.D. Cal. 2005).

74.     During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, Fifth Third's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

75.     Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[2] concerning investment in company stock, including that:

(a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)     Out of loyalty, employees tend to invest in company stock;

---

[2]    Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

76.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the significant investment of the Plan's funds in Company stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

**<u>DEFENDANTS' CONDUCT</u>**

77.     Fifth Third Bancorp operates as a diversified financial services holding company. The Company's Consumer Lending segment is involved in mortgage and home equity lending activities, such as origination, retention, and servicing of mortgage and

home equity loans; other indirect lending activities, which include loans to consumers through mortgage brokers, automobile dealers, and federal and private student education loans. The Company's Commercial Banking segment offers banking, cash management, and financial services; traditional lending and depository products and services; other services, including foreign exchange and international trade finance, derivatives and capital markets services, asset-based lending, real estate finance, public finance, commercial leasing, and syndicated finance for business, government, and professional customers. Its Branch Banking segment provides a range of deposit and loan, and lease products to individuals and corporations. Its products include checking and savings accounts, home equity loans and lines of credit, and credit cards and loans for automobile and personal financing needs. Its Investment Advisors segment offers a range of investment alternatives for individuals, companies, and not-for-profit organizations. This segment also offers investment, trust, asset management, retirement planning, and custody services, as well as retail brokerage services to individual clients and broker dealer services to the institutional marketplace. The Fifth Third Processing Solutions segment offers electronic funds transfer, debit, credit, and merchant transaction processing services; and data processing services.

78. As of March 18, 2008, Fifth Third operated 1,227 full-service banking centers, including 102 Bank Mart locations and 2,211 ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Pennsylvania, Missouri, and Georgia.

79. Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to Plan participants. Although they

knew or should have known that the Company's stock was artificially inflated, due to the Company's exposure to losses arising from the Company's exposure to severe problems in the mortgage and credit markets, Defendants continuously reassured Plan participants and did nothing to protect the heavy investment of their retirement savings in Fifth Third stock.

**Problems Within the Mortgage Market**

80. During the Class Period, Fifth Third's common stock was an imprudent investment for the Plan, due to tremendous problems within the mortgage, housing and credit markets, to which Fifth Third was vulnerable. The crises were initiated by a collapse within the subprime mortgage market and rapidly spread to other areas.

81. Many alternative loan products had been heavily marketed to borrowers. Such products included adjustable rate mortgage ("ARMs"), interest-only loans, 80-20 loans and option-ARMs.

82. As home prices declined and interest rates began to rise in late 2006 and early 2007, the default rates for mortgage loans rose as well.

83. The substantial increase in mortgage loan defaults has had a tremendous impact upon the mortgage market and led to substantial problems within the overall credit and housing markets—markets upon which Fifth Third's business model heavily relied.

84. The Class Period begins on July 19, 2007, when the Company issued a press release and its quarterly financial supplement announcing its earnings for the second quarter of 2007. *See* Form 8-K Submission to the SEC, filed July 19, 2007. The Company reported second quarter 2007 earnings of $376 million, or $0.69 per diluted

share, compared with $359 million, or $0.65 per diluted share, in the first quarter of 2007 and $382 million, or $0.69 per diluted share, for the same period in 2006.

85. The Company downplayed any serious impact from the mortgage/credit crisis. Defendant Kabat stated, "Second quarter results were strong across most areas of the Company." The Company boasted of its 6% revenue growth of six percent, increase in net interest income and 8% fee growth. While acknowledging that "credit is a challenge at this point in the cycle," the Company stated that it was actively managing its credit risks and expected any credit deterioration to remain within its expectations. Defendant Kabat stated, "All told, we were pleased with our results, and remain very focused on executing on our strategic plans and building shareholder value."

86. On August 16, 2007, Fifth Third announced that it would acquire, for $1.1 billion, First Charter Corp., which operated 57 branches in North Carolina and 2 in suburban Atlanta, expanding the Company's Southeast presence. *See* Form 8-K Submission to the SEC, filed August 16, 2007.

87. On September 11, 2007, Fifth Third made a presentation at the Lehman Brothers Financial Services Conference.

88. The Company focused on its "strong expense management" and "strong underlying performance." Additionally, Fifth Third touted its residential mortgage portfolio, noting its average LTV, average weighted FICO scores and level of net charge-offs.

89. On October 19, 2007, Fifth Third issued a press release and its quarterly financial supplement announcing its earnings release for the third quarter of 2007. *See* Form 8-K Submission to the SEC, filed October, 19, 2007.

90.     The Company reported third quarter 2007 earnings of $376 million, or $0.71 per diluted share, compared with $376 million, or $0.69 per diluted share, in the second quarter of 2007 and $377 million, or $0.68 per diluted share, for the same period in 2006.

91.     The Company again downplayed the impact of the mortgage market crisis upon its financial condition, stating that, despite significant market disruption during the quarter, "t]hird quarter results were solid" and the Company was "spared most of its effects."

92.     Defendant Kabat stated that, while, credit continued to be a challenge during the quarter and the Company expected some deterioration in credit trends in the near future, the deterioration would be manageable.  Defendant Kabat, stated, "Overall, we were pleased with our results given the macro environment in this kind of quarter and continue to execute our strategic plans."

93.     The Company concealed its problems stemming from its deterioration in credit quality and the fact that, in reality, it was suffering under the weight of higher loan loss provisions.  In truth, Fifth Third was experiencing greater net charge-offs and had failed to sufficiently raise loan loss provisions to an adequate level.

94.     On November 14, 2007, Fifth Third presented at the Merrill Lynch 2007 Banking & Financial Services Conference.  The Company attempted to focus investors' attention on its expansion in certain markets, including the Southeast and Chicago and its income diversification and diversified loan portfolio.  The Company also boasted that it was experiencing less net charge-offs than its competitors and touted its strong liquidity and capital positions.

95.     On November 29, 2007, Fifth Third Bancorp gave a presentation to analysts at the Fox-Pitt, Kelton Cochran Caronia Waller Financial Services Conference. Again, the Company touted its credit quality and diversified loan portfolio.

96.     On January 22, 2008, as the Company's stock price slid downward, the Company issued its fourth quarter and year-end earnings for 2007. Fifth Third reported 2007 earnings of $1.1 billion, or $2.03 per diluted share, compared with $1.2 billion, or $2.13 per diluted share in 2006. Reported fourth quarter 2007 earnings were $38 million, or $0.07 per diluted share, compared with $325 million, or $0.61 per diluted share in the third quarter of 2007 and $66 million, or $0.12 per diluted share, for the same period in 2006. Further, Fifth Third reported a non-cash estimated charge of $155 million, both pre-tax and after-tax, or $0.29 per share, to lower the current cash surrender value of one of its Bank-Owned Life Insurance ("BOLI") policies.

97.     While acknowledging that the credit markets were under stress, Fifth Third insisted that the Company was performing well overall. The Company stated that:

> We have been actively working over the past year to take steps to address areas of concern. These areas include home equity loans and, more generally, real estate loans, particularly in the upper Midwest and Florida. As a lending institution, we know we will experience credit cycles and we expect them. It is our responsibility to ensure that we are prepared for them and that we have the balance sheet strength and earnings power to manage through them. Fortunately, Fifth Third is well-positioned on both counts, and we intend to continue to focus on executing on our strategic plans and capitalizing on opportunities presented by this environment.

*See* Form 8-K Submission to the SEC, filed January 22, 2008.

98.     However, the Company failed to disclose that non-performing assets were increasing at an alarming rate and, further, that its loan portfolio was in need of a major

capital infusion. Moreover, while positive revenue momentum continued, the Company failed to disclose increasing negative trends in loan loss provisions.

99.     On or about March 17, 2008, Moody's Investors lowered its outlook on Fifth Third to negative, predicting that a deterioration of the bank's core profitability was likely to continue.

100.    Despite the fact that they knew or should have known that Fifth Third stock was an imprudent Plan investment, Defendants took no action whatsoever to protect the Plan's assets from losses.

101.    On April 22, 2008, the Company issued first quarter 2008 earnings of $292 million, or $0.55 per diluted share, compared with $16 million, or $0.03 per diluted share in the fourth quarter of 2007 and $359 million, or $0.65 per diluted share, for the same period in 2007.

102.    The Company tried to focus on the positive.  Defendant Kabat stated that Fifth Third had "produced excellent loan and deposit growth that drove impressive performance in net interest income and continued strong fee growth from our businesses."   While acknowledging higher credit costs, primarily reflecting further deterioration of residential real estate, homebuilder and residential development loans, as well as nonperforming asset growth and higher loan losses, the Company stated that it remained "very active in taking steps to address the issues we and the industry are facing, and to work with borrowers to address difficulties they are experiencing.   Fifth Third also reassured investors that:

> though every credit cycle differs, we expect them to occur. We take seriously our responsibility to provide credit to our customers, to lend prudently, and to maintain the capital necessary to manage through these cycles. This is an

> unusually difficult cycle, but we believe Fifth Third is well-positioned relative to many of its peers. We expect to continue to post strong operating results, to execute on our strategic plans, and to capitalize on the opportunities that are created by an environment such as this.

*See* Form 8-K Submission to the SEC, filed April 22, 2008.

103.    Further, the Company's Tier 1 capital ratio was in need of support because it had continued to deteriorate, necessitating a major infusion of capital.

104.    However, Fifth Third continued to conceal the truth regarding its financial condition and its exposure to mortgage-related losses.  The Company failed to disclose the true magnitude of its ever-increasing provisions for loan and lease losses.

105.    The deception was successful.  Company stock experienced an 8% increase.

106.    Meanwhile, Fifth Third's credit losses were suffering from an unabated trend as the housing market continued to stumble in the Mid-West region and it knew or should have known that its dangerous increase in net charge-offs would continue to climb.

107.    Further, the Company's deteriorating capital base necessitated a sale of non-core businesses to supplement common equity capital.

108.    On May 2, 2008, Fifth Third announced the resignation of its Chief Financial Officer, Christopher G. Marshall.

109.    In mid-May 2008, Bloomberg reported that a sharp decline in a Fifth Third hedge fund investment led to the more than $300 million in charge-offs the bank had taken with respect to its BOLI policies.  While the Company had acknowledged that the charge was caused by "further deterioration in the values of the underlying

investments of the policy," it had failed to disclose that much of the losses came about because of hedge investments within those policies. *Hedge Funds Hurt Fifth Third's Results*, Dayton Business Journal (May 20, 2008).

110. However, Fifth Third continued to conceal the truth regarding its financial condition. During a May 2008 UBS Financial Services conference, Defendant Kabat told a UBS conference that he was "reasonably confident" that bad loans would "not require significant additional reserves to cover losses." Laurie Kulowski, *Banks Continue to Stuff Loan Cushions*, TheStreet.com (May 22, 2008).

111. On May 28, 2008, Fifth Third's common stock fell to its lowest level in a decade—since January 1997— amidst Wall Street speculation that the Company may cut its dividend.

112. At least by the beginning of June 2008, Fifth Third launched a program entitled "You Have Options," designed to reach distressed borrowers in danger of default. On June 9, 2008, Fifth Third completed its $1.1 billion acquisition of First Charter Corp., adding 57 branches in the Southeast, primarily in North Carolina.

113. As a result of Defendants' false statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period. However, Defendants failed to take any action to protect Plan participants from losses, as Fifth Third's financial condition deteriorated.

**The Truth Emerges**

114. On June 18, 2008, the Company announced that, to cope with mounting credit losses, it would slash its quarterly dividend 66% and needed to raise at least $2 billion in additional capital. Additionally, the Company expected to set aside $700 to

$725 million for loan and lease losses and to incur $340 to $350 million of net charge-offs in the second quarter of 2008. Further, the Company announced that it expected its loan loss reserves to grow and its charge-offs in 2009 to be higher than the expected 1.6% to 1.65% in 2008.

115.     The Company said that it would sell $1 billion convertible preferred shares and raise at least $1 billion more capital from selling some of its "non-core" subsidiaries over the next several quarters. This announcement came a month after Defendant Kabat told investors on a conference call that he did not foresee the need' to raise significant common equity.

116.     Further, the Company revealed that earnings could be as little as 1 cent to 5 cents per share, whereas analysts surveyed by Bloomberg had expected an average of more than 40 cents per share. Elizabeth Stanton, *U.S. Stocks Fall on FedEx's Loss, Fifth Third's Dividend Cut*, Bloomberg.com (June 18, 2008).

117.     Essentially, the Company was suffering increasing credit losses, particularly in its residential real estate, commercial mortgage and commercial construction portfolios in Florida and Michigan.

118.     Fifth Third also revealed that it may incur a $250 million charge over its accounting for leveraged leases.

119.     At least one analyst noted that the Company had over-stretched itself with its untimely $1.1 billion acquisition of First Charter Corp. and acquisitions in Florida. Jonathan Stempel, *Fifth Third to Raise $2 bln Capital, Cut Dividend*, Reuters.com (June 18, 2008).

120.    Additionally, the Company announced major changes in its leadership.  It replaced Defendant Schaefer with Defendant Kabat as Chairman of the Board, and named Defendant Hackett as its lead director.

121.    Defendant Kabat admitted, "Our bottom line results won't meet our expectations.  We are not satisfied."

122.    The Company also announced the cost of uncollectible loans in 2009 will rise well above 2008 levels – thereby substantiating the ever increasing (though undisclosed) negative trends pressuring the Company.

123.    These disclosures also indicated that the Company's Tier 1 capital was under pressure, requiring immediate support.

124.    Following the June 18, 2008 announcement, which contrasted sharply to the Company's Class Period statements, Fifth Third common stock dropped as low as 27% and closed at $9.26 per share on very heavy trading volume.

125.    On July 22, 2008, Fifth Third again surprised the market by posting its first loss in at least nine years.  The Company reported a second quarter loss of $202 million, or 37 cents per share, compared a profit of $376 million, or 69 cents per share, during the second quarter of 2007.  Further, the Company revealed that it was setting aside additional money to cover bad debts in distressed housing markets, including Florida and Michigan.   Shortly thereafter, July 23, 2008, Fifth Third's largest shareholder, Cincinnati Financial Corp., sold more than half of its holdings in Fifth Third stock.

126.    As described further herein, Defendants, as fiduciaries of the Plan were obligated to ensure that the Plan's investment alternatives—including the Fifth Third

127.    Since the beginning of the Class Period through the present, the Plan's imprudent investments into the Fifth Third Stock Fund have been decimated, as indicated below:



*Source:* https//Retire.53.com.

**Defendants Knew or Should Have Known That Fifth Third Stock Was an Imprudent Investment For The Plan, Yet Mislead Plan Participants**

128.    During the Class Period, although they knew or should have known that the Company's stock an imprudent Plan investment, due to: (a) the Company's exposure to certain poorly performing real estate markets, including Florida and Michigan, and the extent to which this exposure was materially increasing; (b) the Company's growing exposure to late payments and defaults on mortgages and other non-performing loans, and the extent to which this exposure was materially increasing; (c) the extent of the

decline in the quality of the Company's Tier 1 capital base; (d) the deteriorating credit trends and increasing expenses, including negative trends, in the Company's consumer loan portfolio, including the extent of the increase in late payments and defaults; (e) the negative trends in the Company's home equity and commercial construction loans, and the extent to which there was a decrease in the value of the underlying assets and an increase in late payments and defaults; (f) the fact that, as a consequence of the above, the Company's stock price was artificially inflated; and (g) the fact that heavy investment of retirement savings in Company stock would inevitably result in significant losses to the Plan, and consequently, to its participants, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in Fifth Third stock.

129.    As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in Fifth Third stock, suffered unnecessary and unacceptable losses.

130.    Through their high ranking positions within the Company - especially the Director Defendants and members of the Pension and Profit Sharing Committee, Defendants knew or should have known of the existence of the above-mentioned problems.

131.    Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems within the mortgage and housing markets, the Company stock price would suffer and devastate participants' retirement savings once the truth became known.  Yet, Defendants failed to protect the Plan and its participants from foreseeable losses.

132.    Rather, during the Class Period, despite its obligation to prudently manage the Plan's assets—including its heavy investment in Fifth Third stock—the Company misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock.

133.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Fifth Third stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

134.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Fifth Third stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Fifth Third's problems so that participants could make informed decisions regarding whether to include Fifth Third stock in the Plan.

135.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Fifth Third stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

136. Because Defendants knew or should have known that Fifth Third was not a prudent investment option for the Plan, they had an obligation to protect the Plan and their participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Fifth Third stock.

137. Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plan of Fifth Third stock; discontinuing further contributions to and/or investment in Fifth Third stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by Fifth Third they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Fifth Third stock.

138. Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plan's investment in Fifth Third stock. In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Fifth Third's problems came to light.

**Defendants Suffered From Conflicts of Interest**

139. Fifth Third's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a significant percentage of the CEO's and other Company officers' compensation was in the form of equity awards, including restricted stock and stock options. *See* Fifth Third Definitive Proxy Statement, filed with the SEC on March 6, 2008.

140. Because the compensation of at least some of the Defendants was significantly tied to the price of Fifth Third stock, at least certain of the Defendants had

incentive to keep the Plan's assets heavily invested in Fifth Third stock on a regular, ongoing basis.  Elimination of Company stock as an investment option/vehicle for the Plan would have reduced the overall market demand for Fifth Third stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Fifth Third stock, resulting in reduced compensation for at least certain of the Defendants.

141.    Some Defendants may have had no choice in tying their compensation to Fifth Third stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up to a large extent in Fifth Third stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

142.    These conflicts of interest put certain of Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan.  *See generally Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004).

## <u>CLAIMS FOR RELIEF UNDER ERISA</u>

143.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

144.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

145.　ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

146.　ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

147.　These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."  They entail, among other things:

(h)　The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(i)　A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with

an "eye single" to the interests of the participants and beneficiaries,

regardless of the interests of the fiduciaries themselves or the plan

sponsor;

(j)     A duty to disclose and inform, which encompasses: (1) a negative

duty not to misinform; (2) an affirmative duty to inform when the

fiduciary knows or should know that silence might be harmful; and

(3) a duty to convey complete and accurate information material to

the circumstances of participants and beneficiaries.

148.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-
fiduciary," provides, in pertinent part, that:

> "…in addition to any liability which he may have under
> any other provision of this part, a fiduciary with respect to a
> plan shall be liable for a breach of fiduciary responsibility
> of another fiduciary with respect to the same plan in the
> following circumstances: (A) if he participates knowingly
> in, or knowingly undertakes to conceal, an act or omission
> of such other fiduciary, knowing such act or omission is a
> breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of
> his specific responsibilities which give rise to his status as a
> fiduciary, he has enabled such other fiduciary to commit a
> breach; or (C) if he has knowledge of a breach by such
> other fiduciary, unless he makes reasonable efforts under
> the circumstances to remedy the breach."

149.    Plaintiff therefore brings this action under the authority of ERISA §502(a)

for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising

out of the breaches of fiduciary duties by the Defendants for violations under ERISA

§404(a)(1) and ERISA §405(a).

<u>COUNT I</u>

**FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS
(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND §
405 BY ALL DEFENDANTS)**

150.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

151.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

152.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

153.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan

participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

154.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.  This duty applies to all of the Plan's investment options, including investment in Company stock.

155.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period these Defendants knew or should have known that, as described herein, Fifth Third stock was not a suitable and appropriate investment for the Plan.  Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings.  During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

156. Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's substantial exposure to mortgage-related losses, the Company's concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook. During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

157. The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock. Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

158. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and Beneficiaries, lost a significant portion of their retirement investment.

159.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY ALL DEFENDANTS)

160.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

161.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

162.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

163.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

164.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses.  If Defendants had discharged their

fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

165.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count

## COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY FIFTH THIRD & DIRECTOR DEFENDANTS)

166.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

167.    At all relevant times, as alleged above, Fifth Third and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

168.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Fifth Third and the Director Defendants, including the Compensation Committee, included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the members of the Pension and Profit Sharing Committee.

169.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.    In this case, that means that the monitoring fiduciaries, Fifth Third and the Director Defendants, had the duty to:

(k)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.    They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(l)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(m)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(n)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(o)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(p)    Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants.    The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

170.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

171.    Fifth Third and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.  Fifth Third and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering Fifth Third stock as an investment alternative for the Plan, and (ii) continuing to invest the assets of the Plan in Fifth Third stock when it no longer was prudent to do so.  Despite this knowledge, Fifth Third and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

172.    In addition, Fifth Third and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Fifth Third, including, without limitation, the Company's substantial exposure to mortgage-related losses, which

they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

173.    Fifth Third and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

174.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

175.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

176.    The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan's participants.

177.    Defendants are responsible for losses caused by participants' failure to exercise voluntary diversification options because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over

the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  By failing to apprise participants of the problems within the Company and of the fact that the Company stock price was artificially inflated, as further described infra, Defendants misrepresented the soundness of Company stock as an investment vehicle.  As a consequence, participants did not exercise independent control over their investments in the Company stock, and Defendants remain liable under ERISA for losses caused by such investment.

178.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

179.    As noted above, as a consequence of the Defendants' breaches, the Plan suffered significant losses.

180.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

181.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the

investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

182.    Plaintiff, the Plan, and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

183.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## SECTION 404(C) DEFENSE INAPPLICABLE

184.    The Plan suffered losses, and Plaintiff and the other Class members suffered losses, because substantial assets in the Plan were invested in Fifth Third stock during the Class Period in violation of the Defendants' fiduciary duties.

185.    As to contributions invested in Company stock, Defendants were responsible for the prudence of investments provided under the Plan during the Class

Period, unless the Plan satisfied the procedural and substantive requires of ERISA §

404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

186.    Section 404(c) provides a limited exception to fiduciary liability for losses

that result from participants' exercise of control over investment decisions, but not for

liability for the selection of imprudent investment options for the Plan.  In order for §

404(c) to apply, participants must in fact exercise "independent control" over investment

decisions.  In addition, § 404(c) only applies if participants are informed that "the Plan is

intended to constitute a plan described in § 404(c) and [the regulations], and that

fiduciaries of the plan may be relieved of liability for any losses which are the direct and

necessary result of investment instructions given by such participants or Beneficiary."  29

C.F.R. § 2550.404c-1(b)(2)(B)(1)(i).

187.    ERISA § 404(c) does not and cannot provide any defense to the

fiduciaries' imprudent decision to select and continue offering Fifth Third stock as an

investment option in the Plan, as this is not a decision that was made or controlled by the

participants.  As alleged above, Defendants failed to provide participants with complete

and accurate information regarding the prudence investing Plan assets in Fifth Third

stock.  Accordingly, participants failed to exercise the requisite independent control over

their investment in Fifth Third stock in the Plan.  Thus, a fiduciary breach or an

investment loss in connection with the Plan fiduciaries' selection of the Fifth Third Stock

Fund as a designated Plan investment alternative is not afforded relief under section

404(c) because it was not the result of participants' exercise of control.

188.    The Defendants' liability to the Plan, Plaintiff and the Class for relief

stemming from the Plan's imprudent investments in Fifth Third stock, is established upon

proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common

stock of Fifth Third maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock price of Fifth Third;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED: September 11, 2008                  Respectfully submitted,


Robert M. Smyth
**DREW & WARD CO., LPA**
1 W. Fourth St., Suite 2400
Cincinnati, OH 45202
Telephone: (513) 621-8210
Facsimile: (513) 621-5444

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff and the Proposed Class*